Justice Kennedy
delivered the opinion of the Court.
In Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373 (1911), the Court established the rule that it is per se illegal under § 1 of the Sherman Act, 15 U. S. C. § 1, for a manufacturer to agree with its distributor to set the minimum price the distributor can charge for the manufacturer’s goods. The question presented by the instant case is *882 whether the Court should overrule the per se rule and allow resale price maintenance agreements to be judged by the rule of reason, the usual standard applied to determine if there is a violation of § 1. The Court has abandoned the rule of per se illegality for other vertical restraints a manufacturer imposes on its distributors. Respected economic analysts, furthermore, conclude that vertical price restraints can have procompetitive effects. We now hold that Dr. Miles should be overruled and that vertical price restraints are to be judged by the rule of reason.
I
Petitioner, Leegin Creative Leather Products, Inc. (Lee-gin), designs, manufactures, and distributes leather goods and accessories. In 1991, Leegin began to sell belts under the brand name “Brighton.” The Brighton brand has now expanded into a variety of women’s fashion accessories. It is sold across the United States in over 5,000 retail establishments, for the most part independent, small boutiques and specialty stores. Leegin’s president, Jerry Kohl, also has an interest in about 70 stores that sell Brighton products. Lee-gin asserts that, at least for its products, small retailers treat customers better, provide customers more services, and make their shopping experience more satisfactory than do larger, often impersonal retailers. Kohl explained: “[W]e want the consumers to get a different experience than they get in Sam’s Club or in Wal-Mart. And you can’t get that kind of experience or support or customer service from a store like Wal-Mart.” 5 Record 127.
Respondent, PSKS, Inc. (PSKS), operates Kay’s Kloset, a women’s apparel store in Lewisville, Texas. Kay’s Kloset buys from about 75 different manufacturers and at one time sold the Brighton brand. It first started purchasing Brighton goods from Leegin in 1995. Once it began selling the brand, the store promoted Brighton. For example, it ran Brighton advertisements and had Brighton days in the store. *883 Kay’s Kloset became the destination retailer in the area to buy Brighton products. Brighton was the store’s most important brand and once accounted for 40 to 50 percent of its profits.
In 1997, Leegin instituted the “Brighton Retail Pricing and Promotion Policy.” 4 id., at 939. Following the policy, Leegin refused to sell to retailers that discounted Brighton goods below suggested prices. The policy contained an exception for products not selling well that the retailer did not plan on reordering. In the letter to retailers establishing the policy, Leegin stated:
“In this age of mega stores like Macy’s, Bloomingdales, May Co. and others, consumers are perplexed by promises of product quality and support of product which we believe is lacking in these large stores. Consumers are further confused by the ever popular sale, sale, sale, etc.
“We, at Leegin, choose to break away from the pack by selling [at] specialty stores; specialty stores that can offer the customer great quality merchandise, superb service, and support the Brighton product 365 days a year on a consistent basis.
“We realize that half the equation is Leegin producing great Brighton product and the other half is you, our retailer, creating great looking stores selling our products in a quality manner.” Ibid.
Leegin adopted the policy to give its retailers sufficient margins to provide customers the service central to its distribution strategy. It also expressed concern that discounting harmed Brighton’s brand image and reputation.
A year after instituting the pricing policy Leegin introduced a marketing strategy known as the “Heart Store Program.” See id., at 962-972. It offered retailers incentives to become Heart Stores, and, in exchange, retailers pledged, among other things, to sell at Leegin’s suggested prices. Kay’s Kloset became a Heart Store soon after Leegin created *884 the program. After a Leegin employee visited the store and found it unattractive, the parties appear to have agreed that Kay’s Kloset would not be a Heart Store beyond 1998. Despite losing this status, Kay’s Kloset continued to increase its Brighton sales.
In December 2002, Leegin discovered Kay’s Kloset had been marking down Brighton’s entire line by 20 percent. Kay’s Kloset contended it placed Brighton products on sale to compete with nearby retailers who also were undercutting Leegin’s suggested prices. Leegin, nonetheless, requested that Kay’s Kloset cease discounting. Its request refused, Leegin stopped selling to the store. The loss of the Brighton brand had a considerable negative impact on the store’s revenue from sales.
PSKS sued Leegin in the United States District Court for the Eastern District of Texas. It alleged, among other claims, that Leegin had violated the antitrust laws by “enter-ting] into agreements with retailers to charge only those prices fixed by Leegin.” Id., at 1236. Leegin planned to introduce expert testimony describing the procompetitive effects of its pricing policy. The District Court excluded the testimony, relying on the per se rule established by Dr. Miles. At trial PSKS argued that the Heart Store program, among other things, demonstrated Leegin and its retailers had agreed to fix prices. Leegin responded that it had established a unilateral pricing policy lawful under § 1, which applies only to concerted action. See United States v. Colgate & Co., 250 U. S. 300, 307 (1919). The jury agreed with PSKS and awarded it $1.2 million. Pursuant to 15 U. S. C. § 15(a), the District Court trebled the damages and reimbursed PSKS for its attorney’s fees and costs. It entered judgment against Leegin in the amount of $3,975,000.80.
The Court of Appeals for the Fifth Circuit affirmed. 171 Fed. Appx. 464 (2006) (per curiam). On appeal Leegin did not dispute that it had entered into vertical price-fixing agreements with its retailers. Rather, it contended that the *885 rule of reason should have applied to those agreements. The Court of Appeals rejected this argument. Id., at 466-467. It was correct to explain that it remained bound by Dr. Miles “[b]ecause [the Supreme] Court has consistently applied the per se rule to [vertical minimum price-fixing] agreements.” 171 Fed. Appx., at 466. On this premise the Court of Appeals held that the District Court did not abuse its discretion in excluding the testimony of Leegin’s economic expert, for the per se rule rendered irrelevant any procompetitive justifications for Leegin’s pricing policy. Id., at 467. We granted certiorari to determine whether vertical minimum resale price maintenance agreements should continue to be treated as per se unlawful. 549 U. S. 1092 (2006).
II
Section 1 of the Sherman Act prohibits “[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.” Ch. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1. While § 1 could be interpreted to proscribe all contracts, see, e. g., Board of Trade of Chicago v. United States, 246 U. S. 231, 238 (1918), the Court has never “taken a literal approach to [its] language,” Texaco Inc. v. Dagher, 547 U. S. 1, 5 (2006). Rather, the Court has repeated time and again that § 1 “outlaw[s] only unreasonable restraints.” State Oil Co. v. Khan, 522 U. S. 3, 10 (1997).
The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1. See Texaco, supra, at 5. “Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.” Continental T. V., Inc. v. GTE Sylvania Inc., 433 U. S. 36, 49 (1977). Appropriate factors to take into account include “specific information about the relevant business” and “the restraint’s history, nature, and effect.” Khan, supra, at 10. Whether the busi *886 nesses involved have market power is a further, significant consideration. See, e. g., Copperweld Corp. v. Independence Tube Corp., 467 U. S. 752, 768 (1984) (equating the rule of reason with “an inquiry into market power and market structure designed to assess [a restraint’s] actual effect”); see also Illinois Tool Works Inc. v. Independent Ink, Inc., 547 U. S. 28, 45-46 (2006). In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer’s best interest.
The rule of reason does not govern all restraints. Some types “are deemed unlawful per se.” Khan, supra, at 10. The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work, Business Electronics Corp. v. Sharp Electronics Corp., 485 U. S. 717, 723 (1988); and, it must be acknowledged, the per se rule can give clear guidance for certain conduct. Restraints that are per se unlawful include horizontal agreements among competitors to fix prices, see Texaco, supra, at 5, or to divide markets, see Palmer v. BRG of Ga., Inc., 498 U. S. 46, 49-50 (1990) (per curiam).
Resort to per se rules is confined to restraints, like those mentioned, “that would always or almost always tend to restrict competition and decrease output.” Business Electronics, supra, at 723 (internal quotation marks omitted). To justify a per se prohibition a restraint must have “manifestly anticompetitive” effects, GTE Sylvania, supra, at 50, and “lack .. . any redeeming virtue,” Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U. S. 284, 289 (1985) (internal quotation marks omitted).
As a consequence, the per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue, see Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U. S. 1, 9 (1979), and only if courts can predict with confidence that it would be invali *887 dated in all or almost all instances under the rule of reason, see Arizona v. Maricopa County Medical Soc., 457 U. S. 332, 344 (1982). It should come as no surprise, then, that “we have expressed reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.” Khan, supra, at 10 (internal quotation marks omitted); see also White Motor Co. v. United States, 372 U. S. 253, 263 (1963) (refusing to adopt a per se rule for a vertical nonprice restraint because of the uncertainty concerning whether this type of restraint satisfied the demanding standards necessary to apply a per se rule). And, as we have stated, a “departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.” GTE Sylvania, supra, at 58-59.
Ill
The Court has interpreted Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, as establishing a per se rule against a vertical agreement between a manufacturer and its distributor to set minimum resale prices. See, e. g., Monsanto Co. v. Spray-Rite Service Corp., 465 U. S. 752, 761 (1984). In Dr. Miles the plaintiff, a manufacturer of medicines, sold its products only to distributors who agreed to resell them at set prices. The Court found the manufacturer’s control of resale prices to be unlawful. It relied on the common-law rule that “a general restraint upon alienation is ordinarily invalid." 220 U. S., at 404-405. The Court then explained that the agreements would advantage the distributors, not the manufacturer, and were analogous to a combination among competing distributors, which the law treated as void. Id., at 407-408.
The reasoning of the Court’s more recent jurisprudence has rejected the rationales on which Dr. Miles was based. By relying on the common-law rule against restraints on alienation, id., at 404-405, the Court justified its decision *888 based on “formalistic” legal doctrine rather than “demonstrable economic effect,” GTE Sylvania, 433 U. S., at 58-59. The Court in Dr. Miles relied on a treatise published in 1628, but failed to discuss in detail the business reasons that would motivate a manufacturer situated in 1911 to make use of vertical price restraints. Yet the Sherman Act’s use of “restraint of trade” “invokes the common law itself, . . . not merely the static content that the common law had assigned to the term in 1890.” Business Electronics, supra, at 732. The general restraint on alienation, especially in the age when then-Justice Hughes used the term, tended to evoke policy concerns extraneous to the question that controls here. Usually associated with land, not chattels, the rule arose from restrictions removing real property from the stream of commerce for generations. The Court should be cautious about putting dispositive weight on doctrines from antiquity but of slight relevance. We reaffirm that “the state of the common law 400 or even 100 years ago is irrelevant to the issue before us: the effect of the antitrust laws upon vertical distributional restraints in the American economy today.” GTE Sylvania, supra, at 53, n. 21 (internal quotation marks omitted).
Dr. Miles, furthermore, treated vertical agreements a manufacturer makes with its distributors as analogous to a horizontal combination among competing distributors. See 220 U. S., at 407-408. In later cases, however, the Court rejected the approach of reliance on rules governing horizontal restraints when defining rules applicable to vertical ones. See, e.g., Business Electronics, supra, at 734 (disclaiming, the “notion of equivalence between the scope of horizontal per se illegality and that of vertical per se illegality”); Maricopa County, supra, at 348, n. 18 (noting that “horizontal restraints are generally less defensible than vertical restraints”). Our recent cases formulate antitrust principles in accordance with the appreciated differences in economic effect between vertical and horizontal agreements, differences the Dr. Miles Court failed to consider.
*889 The reasons upon which Dr. Miles relied do not justify a per se rule. As a consequence, it is necessary to examine, in the first instance, the economic effects of vertical agreements to fix minimum resale prices, and to determine whether the per se rule is nonetheless appropriate. See Business Electronics, 485 U. S., at 726.
A
Though each side of the debate can find sources to support its position, it suffices to say here that economics literature is replete with procompetitive justifications for a manufacturer’s use of resale price maintenance. See, e. g., Brief for Economists as Amici Curiae 16 (“In the theoretical literature, it is essentially undisputed that minimum [resale price maintenance] can have procompetitive effects and that under a variety of market conditions it is unlikely to have anticompetitive effects”); Brief for United States as Amicus Curiae 9 (“[T]here is a widespread consensus that permitting a manufacturer to control the price at which its goods are sold may promote mferbrand competition and consumer welfare in a variety of ways”); ABA Section of Antitrust Law, Antitrust Law and Economics of Product Distribution 76 (2006) (“[T]he bulk of the economic literature on [resale price maintenance] suggests that [it] is more likely to be used to enhance efficiency than for anticompetitive purposes”); see also H. Hovenkamp, The Antitrust Enterprise: Principle and Execution 184-191 (2005) (hereinafter Hovenkamp); R. Bork, The Antitrust Paradox 288-291 (1978) (hereinafter Bork). Even those more skeptical of resale price maintenance acknowledge it can have procompetitive effects. See, e. g., Brief for William S. Comanor et al. as Amici Curiae 3 (“[G]iven [the] diversity of effects [of resale price maintenance], one could reasonably take the position that a rule of reason rather than a per se approach is warranted”); F. Scherer & D. Ross, Industrial Market Structure and Economic Performance 558 (3d ed. 1990) (hereinafter Scherer & Ross) (“The overall bal *890 anee between benefits and costs [of resale price maintenance] is probably close”).
The few recent studies documenting the competitive effects of resale price maintenance also cast doubt on the conclusion that the practice meets the criteria for a per se rule. See Bureau of Economics Staff Report to the FTC, T. Overstreet, Resale Price Maintenance: Economic Theories and Empirical Evidence 170 (1983) (hereinafter Overstreet) (noting that “[e]fficient uses of [resale price maintenance] are evidently not unusual or rare”); see also Ippolito, Resale Price Maintenance: Empirical Evidence From Litigation, 34 J. Law & Econ. 263,292-293 (1991) (hereinafter Ippolito).
The justifications for vertical price restraints are similar to those for other vertical, restraints. See GTE Sylvania, 433 U. S., at 54-57. Minimum resale price maintenance can stimulate interbrand competition — the competition among manufacturers selling different brands of the same type of product — by reducing intrabrand competition — the competition among retailers selling the same brand. See id., at 51-52. The promotion of interbrand competition is important because “the primary purpose of the antitrust laws is to protect [this type of] competition.” Khan, 522 U. S., at 15. A single manufacturer’s use of vertical price restraints tends to eliminate intrabrand price competition; this in turn encourages retailers to invest in tangible or intangible services or promotional efforts that aid the manufacturer’s position as against rival manufacturers. Resale price maintenance also has the potential to give consumers more options so that they can choose among low-price, low-service brands; high-price, high-service brands; and brands that fall in between.
Absent vertical price, restraints, the retail services that enhance interbrand competition might be underprovided. This is because discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand those services generate. GTE Sylvania, supra, at 55. Consumers might learn, for example, about *891 the benefits of a manufacturer’s product from a retailer that invests in fine showrooms, offers product demonstrations, or hires and trains knowledgeable employees. R. Posner, Antitrust Law 172-173 (2d ed. 2001) (hereinafter Posner). Or consumers might decide to buy the product because they see it in a retail establishment that has a reputation for selling high-quality merchandise. Marvel & McCafferty, Resale Price Maintenance and Quality Certification, 15 Rand J. Econ. 346,347-349 (1984) (hereinafter Marvel & McCafferty). If the consumer can then buy the product from a retailer that discounts because it has not spent capital providing services or developing a quality reputation, the high-service retailer will lose sales to the discounter, forcing it to cut back its services to a level lower than consumers would otherwise prefer. Minimum resale price maintenance alleviates the problem because it prevents the discounter from undercutting the service provider. With price competition decreased, the manufacturer’s retailers compete among themselves over services.
Resale price maintenance, in addition, can increase inter-brand competition by facilitating market entry for new firms and brands. “[N]ew manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer.” GTE Sylvania, supra, at 55; see Marvel & McCafferty 349 (noting that reliance on a retailer’s reputation “will decline as the manufacturer’s brand becomes better known, so that [resale price maintenance] may be particularly important as a competitive device for new entrants”). New products and new brands are essential to a dynamic economy, and if markets can be penetrated by using resale price maintenance there is a procompetitive effect.
Resale price maintenance can also increase interbrand competition by encouraging retailer services that would not *892 be provided even absent free riding. It may be difficult and inefficient for a manufacturer to make and enforce a contract with a retailer specifying the different services the retailer must perform. Offering the retailer a guaranteed margin and threatening termination if it does not live up to expectations may be the most efficient way to expand the manufacturer’s market share by inducing the retailer’s performance and allowing it to use its own initiative and experience in providing valuable services. See Mathewson & Winter, The Law and Economics of Resale Price Maintenance, 13 Rev. Indus. Org. 57,74-75 (1998) (hereinafter Mathewson & Winter); Klein & Murphy, Vertical Restraints as Contract Enforcement Mechanisms, 31 J. Law & Econ. 265, 295 (1988); see also Deneckere, Marvel, & Peck, Demand Uncertainty, Inventories, and Resale Price Maintenance, 111 Q. J. Econ. 885, 911 (1996) (noting that resale price maintenance may be beneficial to motivate retailers to stock adequate inventories of a manufacturer’s goods in the face of uncertain consumer demand).
B
While vertical agreements setting minimum resale prices can have procompetitive justifications, they may have anti-competitive effects in other cases; and unlawful price fixing, designed solely to obtain monopoly profits, is an ever-present temptation. Resale price maintenance may, for example, facilitate a manufacturer cartel. See Business Electronics, 485 U. S., at 725. An unlawful cartel will seek to discover if some manufacturers are undercutting the cartel’s fixed prices. Resale price maintenance could assist the cartel in identifying price-cutting manufacturers who benefit from the lower prices they offer. Resale price maintenance, furthermore, could discourage a manufacturer from cutting prices to retailers with the concomitant benefit of cheaper prices to consumers. See ibid,.; see also Posner 172; Overstreet 19-23.
*893 Vertical price restraints also “might be used to organize cartels at the retailer level.” Business Electronics, supra, at 725-726. A group of retailers might collude to fix prices to consumers and then compel a manufacturer to aid the unlawful arrangement with resale price maintenance. In that instance the manufacturer does not establish the practice to stimulate services or to promote its brand but to give inefficient retailers higher profits. Retailers with better distribution systems and lower cost structures would be prevented from charging lower prices by the agreement. See Posner 172; Overstreet 13-19. Historical examples suggest this possibility is a legitimate concern. See, e. g., Marvel & McCafferty, The Welfare Effects of Resale Price Maintenance, 28 J. Law & Econ. 363, 373 (1985) (hereinafter Marvel) (providing an example of the power of the National Association of Retail Druggists to compel manufacturers to use resale price maintenance); Hovenkamp 186 (suggesting that the retail druggists in Dr. Miles formed a cartel and used manufacturers to enforce it).
A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, per se unlawful. See Texaco, 547 U. S., at 5; GTE Sylvania, 433 U. S., at 58, n. 28. To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason. This type of agreement may also be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.
Resale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer. A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs. A manufacturer might consider it has little choice but to accommodate the retailer’s demands for vertical price restraints if the manufacturer believes it needs access to the retailer’s *894 distribution network. See Overstreet 31; 8 P. Areeda & H. Hovenkamp, Antitrust Law 47 (2d ed. 2004) (hereinafter Areeda & Hovenkamp); cf. Toys “R” Us, Inc. v. FTC, 221 F. 3d 928, 937-938 (CA7 2000). A manufacturer with market power, by comparison, might use resale price maintenance to give retailers an incentive not to sell the products of smaller rivals or new entrants. See, e.g., Marvel 366-368. As should be evident, the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated.
C
Notwithstanding the risks of unlawful conduct, it cannot be stated with any degree of confidence that resale price maintenance “always or almost always tend[s] to restrict competition and decrease output.” Business Electronics, supra, at 723 (internal quotation marks omitted). Vertical agreements establishing minimum resale prices can have either procompetitive or anticompetitive effects, depending upon the circumstances in which they are formed. And although the empirical evidence on the topic is limited, it does not suggest efficient uses of the agreements are infrequent or hypothetical. See Overstreet 170; see also id., at 80 (noting that for the majority of enforcement actions brought by the Federal Trade Commission between 1965 and 1982, “the use of [resale price maintenance] was not likely motivated by collusive dealers who had successfully coerced their suppliers”); Ippolito 292 (reaching a similar conclusion). As the rule would proscribe a significant amount of procompetitive conduct, these agreements appear ill suited for per se condemnation.
Respondent contends, nonetheless, that vertical price restraints should be per se unlawful because of the administrative convenience of per se rules. See, e. g., GTE Sylvania, supra, at 50, n. 16 (noting “per se rules tend to provide guidance to the business community and to minimize the burdens on litigants and the judicial system”). That argument sug *895 gests per se illegality is the rule rather than the exception. This misinterprets our antitrust law. Per se rules may decrease administrative costs, but that is only part of the equation. Those rules can be counterproductive. They can increase the total cost of the antitrust system by prohibiting procompetitive conduct the antitrust laws should encourage. See Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L. J. 135, 158 (1984) (hereinafter Easterbrook). They also may increase litigation costs by promoting frivolous suits against legitimate practices. The Court has thus explained that administrative “advantages are not sufficient in themselves to justify the creation of per se rules,” GTE Sylvania, 433 U. S., at 50, n. 16, and has relegated their use to restraints that are “manifestly anticompetitive,” id., at 49-50. Were the Court now to conclude that vertical price restraints should be per se illegal based on administrative costs, we would undermine, if not overrule, the traditional “demanding standards” for adopting per se rules. Id., at 50. Any possible reduction in administrative costs cannot alone justify the Dr. Miles rule.
Respondent also argues the per se rule is justified because a vertical price restraint can lead to higher prices for the manufacturer’s goods. See also Overstreet 160 (noting that “price surveys indicate that [resale price maintenance] in most cases increased the prices of products sold”). Respondent is mistaken in relying on pricing effects absent a further showing of anticompetitive conduct. Cf. id., at 106 (explaining that price surveys “do not necessarily tell us anything conclusive about the welfare effects of [resale price maintenance] because the results are generally consistent with both procompetitive and anticompetitive theories”). For, as has been indicated already, the antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result. See Khan, 522 U. S., at 15. The Court, moreover, has evaluated other vertical restraints under the rule of reason even though prices can be *896 increased in the course of promoting procompetitive effects. See, e. g., Business Electronics, 485 U. S., at 728. And resale price maintenance may reduce prices if manufacturers have resorted to costlier alternatives of controlling resale prices that are not per se unlawful. See infra, at 902-904; see also Marvel 371.
Respondent’s argument, furthermore, overlooks that, in general, the interests of manufacturers and consumers are aligned with respect to retailer profit margins. The difference between the price a manufacturer charges retailers and the price retailers charge consumers represents part of the manufacturer’s cost of distribution, which, like any other cost, the manufacturer usually desires to minimize. See GTE Sylvania, 433 U. S., at 56, n. 24; see also id., at 56 (“Economists . . . have argued that manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products”). A manufacturer has no incentive to over compensate retailers with unjustified margins. The retailers, not the manufacturer, gain from higher retail prices. The manufacturer often loses; interbrand competition reduces its competitiveness and market share because consumers will “substitute a different brand of the same product.” Id., at 52, n. 19; see Business Electronics, supra, at 725. As a general matter, therefore, a single manufacturer will desire to set minimum resale prices only if the “increase in demand resulting from enhanced service . . . will more than offset a negative impact on demand of a higher retail price.” Mathewson & Winter 67.
The implications of respondent’s position are far reaching. Many decisions a manufacturer makes and carries out through concerted action can lead to higher prices. A manufacturer might, for example, contract with different suppliers to obtain better inputs that improve product quality. Or it might hire an advertising agency to promote awareness of its goods. Yet no one would think these actions violate the *897 Sherman Act because they lead to higher prices. The antitrust laws do not require manufacturers to produce generic goods that consumers do not know about or want. The manufacturer strives to improve its product quality or to promote its brand because it believes this conduct will lead to increased demand despite higher prices. The same can hold true for resale price maintenance.
Resale price maintenance, it is true, does have economic dangers. If the rule of reason were to apply to vertical price restraints, courts would have to be diligent in eliminating their anticompetitive uses from, the market. This is a realistic objective, and certain factors are relevant to the inquiry. For example, the number of manufacturers that make use of the practice in a given industry can provide important instruction. When only a few manufacturers lacking market power adopt the practice, there is little likelihood it is facilitating a manufacturer cartel, for a cartel then can be undercut by rival manufacturers. See Overstreet 22; Bork 294. Likewise, a retailer cartel is unlikely when only a single manufacturer in a competitive market uses resale price maintenance. Interbrand competition would divert consumers to lower priced substitutes and eliminate any gains to retailers from their price-fixing agreement over a single brand. See Posner 172; Bork 292. Resale price maintenance should be subject to more careful scrutiny, by contrast, if many competing manufacturers adopt the practice. Cf. Scherer & Ross 558 (noting that “except when [resale price maintenance] spreads to cover the bulk of an industry’s output, depriving consumers of a meaningful choice between high-service and low-price outlets, most [resale price maintenance arrangements] are probably innocuous”); Easterbrook 162 (suggesting that “every one of the potentially-anticompetitive outcomes of vertical arrangements depends on the uniformity of the practice”).
The source of the restraint may also be an important consideration. If there is evidence retailers were the impetus *898 for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer. See Brief for William S. Comanor et al. as Amici Curiae 7-8. If, by contrast, a manufacturer adopted the policy independent of retailer pressure, the restraint is less likely to promote anticompetitive conduct. Cf. Posner 177 (“It makes all the difference whether minimum retail prices are imposed by the manufacturer in order to evoke point-of-sale services or by the dealers in order to obtain monopoly profits”). A manufacturer also has an incentive to protest inefficient retailer-induced price restraints because they can harm its competitive position.
As a final matter, that a dominant manufacturer or retailer can abuse resale price maintenance for anticompetitive purposes may not be a serious concern unless the relevant entity has market power. If a retailer lacks market power, manufacturers likely can sell their goods through rival retailers. See also Business Electronics, supra, at 727, n. 2 (noting “[r]etail market power is rare, because of the usual presence of interbrand competition and other dealers”). And if a manufacturer lacks market power, there is less likelihood it can use the practice to keep competitors away from distribution outlets.
The rule of reason is designed and used to eliminate anti-competitive transactions from the market. This standard principle applies to vertical price restraints. A party alleging injury from a vertical agreement setting minimum resale prices will have, as a general matter, the information and resources available to show the existence of the agreement and its scope of operation. As courts gain experience considering the effects of these restraints by applying the rule of reason over the course of decisions, they can establish the litigation structure to ensure the rule operates to eliminate anticompetitive restraints from the market and to provide more guidance to businesses. Courts can, for example, devise rules over time for offering proof, or even presumptions *899 where justified, to make the rule of reason a fair and efficient way to prohibit anticompetitive restraints and to promote procompetitive ones.
For all of the foregoing reasons, we think that were the Court considering the issue as an original matter, the rule of reason, not a per se rule of unlawfulness, would be the appropriate standard to judge vertical price restraints.
IV
We do not write on a clean slate, for the decision in Dr. Miles is almost a century old. So there is an argument for its retention on the basis of stare decisis alone. Even if Dr. Miles established an erroneous rule, “[s]tare decisis reflects a policy judgment that in most matters it is more important that the applicable rule of law be settled than that it be settled right.” Khan, 522 U. S., at 20 (internal quotation marks omitted). And concerns about maintaining settled law are strong when the question is one of statutory interpretation. See, e. g., Hohn v. United States, 524 U. S. 236, 251 (1998).
Stare decisis is not as significant in this case, however, because the issue before us is the scope of the Sherman Act. Khan, supra, at 20 (“[T]he general presumption that legislative changes should be left to Congress has less force with respect to the Sherman Act”). From the beginning the Court has treated the Sherman Act as a common-law statute. See National Soc. of Professional Engineers v. United States, 435 U. S. 679, 688 (1978); see also Northwest Airlines, Inc. v. Transport Workers, 451 U. S. 77, 98, n. 42 (1981) (“In antitrust, the federal courts ... act more as common-law courts than in other areas governed by federal statute”). Just as the common law adapts to modern understanding and greater experience, so too does the Sherman Act’s prohibition on “restraint^] of trade” evolve to meet the dynamics of present economic conditions. The case-by-case adjudication contemplated by the rule of reason has implemented this common-law approach. See National Soc. of Professional *900 Engineers, supra, at 688. Likewise, the boundaries of the doctrine of per se illegality should not be immovable. For “[i]t would make no sense to create out of the single term ‘restraint of trade’ a chronologically schizoid statute, in which a ‘rule of reason' evolves with new circumstances and new wisdom, but a line of per se illegality remains forever fixed where it was.” Business Electronics, 485 U. S., at 732.
A
Stare decisis, we conclude, does not compel our continued adherence to the per se rule against vertical price restraints. As discussed earlier, respected authorities in the economics literature suggest the per se rule is inappropriate, and there is now widespread agreement that resale price maintenance can have procompetitive effects. See, e. g., Brief for Economists as Amici Curiae 16. It is also significant .that both the Department of Justice and the Federal Trade Commission — the antitrust enforcement agencies with the ability to assess the long-term impacts of resale price maintenance— have recommended that this Court replace the per se rule with the traditional rule of reason. See Brief for United States as Amicus Curiae 6. In the antitrust context the fact that a decision has been “called into serious question” justifies our reevaluation of it. Khan, supra, at 21.
Other considerations reinforce the conclusion that Dr. Miles should be overturned. Of most relevance, “we have overruled our precedents when subsequent cases have undermined their doctrinal underpinnings.” Dickerson v. United States, 530 U. S. 428, 443 (2000). The Court’s treatment of vertical restraints has progressed away from Dr. Miles' strict approach. We have distanced ourselves from the opinion’s rationales. See supra, at 887-889; see also Khan, supra, at 21 (overruling a case when “the views underlying [it had been] eroded by this Court’s precedent”); Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U. S. 477, 480-481 (1989) (same). This is unsurprising, for the case was decided not long after enactment of the *901 Sherman Act when the Court had little experience with antitrust analysis. Only eight years after Dr. Miles, moreover, the Court reined in the decision by holding that a manufacturer can announce suggested resale prices and refuse to deal with distributors who do not follow them. Colgate, 250 U. S., at 307-308.
In more recent cases the Court, following a common-law approach, has continued to temper, limit, or overrule once strict prohibitions on vertical restraints. In 1977, the Court overturned the per se rule for vertical nonprice restraints, adopting the rule of reason in its stead. GTE Sylvania, 433 U. S., at 57-59 (overruling United States v. Arnold, Schwinn & Co., 388 U. S. 365 (1967)); see also 433 U. S., at 58, n. 29 (noting “that the advantages of vertical restrictions should not be limited to the categories of new entrants and failing firms”). While the Court in a footnote in GTE Sylvania suggested that differences between vertical price and nonprice restraints could support different legal treatment, see id., at 51, n. 18, the central part of the opinion relied on authorities and arguments that find unequal treatment “difficult to justify,” id., at 69-70 (White, J., concurring in judgment).
Continuing in this direction, in two cases in the 198Q’s the Court defined legal rules to limit the reach of Dr. Miles and to accommodate the doctrines enunciated in GTE Sylvania and Colgate. See Business Electronics, supra, at 726-728; Monsanto, 465 U. S., at 763-764. In Monsanto, the Court required that antitrust plaintiffs alleging a § 1 price-fixing conspiracy must present evidence tending to exclude the possibility a manufacturer and its distributors acted in an independent manner. Id., at 764. Unlike Justice Brennan’s concurrence, which rejected arguments that Dr. Miles should be overruled, see 465 U. S., at 769, the Court “decline[d] to reach the question” whether vertical agreements fixing resale prices always should be unlawful because neither party suggested otherwise, id., at 761-762, n. 7. In *902 Business Electronics the Court further narrowed the scope of Dr. Miles. It held that the per se rule applied only to specific agreements over price levels and not to an agreement between a manufacturer and a distributor to terminate a price-cutting distributor. 485 U. S., at 726-727, 735-736.
Most recently, in 1997, after examining the issue of vertical maximum price-fixing agreements in light of commentary and real experience, the Court overruled a 29-year-old precedent treating those agreements as per se illegal. Khan, 522 U. S., at 22 (overruling Albrecht v. Herald Co., 390 U. S. 145 (1968)). It held instead that they should be evaluated under the traditional rule of reason. 522 U. S., at 22. Our continued limiting of the reach of the decision in Dr. Miles and our recent treatment of other vertical restraints justify the conclusion that Dr. Miles should not be retained.
The Dr. Miles rule is also inconsistent with a principled framework, for it makes little economic sense when analyzed with our other cases on vertical restraints. If we were to decide the procompetitive effects of resale price maintenance were insufficient to overrule Dr. Miles, then cases such as Colgate and GTE Sylvania themselves would be called into question. These later decisions, while they may result in less intrabrand competition, can be justified because they permit manufacturers to secure the procompetitive benefits associated with vertical price restraints through other methods. The other methods, however, could be less efficient for a particular manufacturer to establish and sustain. The end result hinders competition and consumer welfare because manufacturers are forced to engage in second-best alternatives and because consumers are required to shoulder thé increased expense of the inferior practices.
The manufacturer has a number of legitimate options to achieve benefits similar to those provided by vertical price restraints. A manufacturer can exercise its Colgate right to refuse to deal with retailers that do not follow its suggested prices. See 250 U. S., at 307. The economic effects of uni *903 lateral and concerted price setting are in general the same. See, e. g., Monsanto, 465 U. S., at 762-764. The problem for the manufacturer is that a jury might conclude its unilateral policy was really a vertical agreement, subjecting it to treble damages and potential criminal liability. Ibid.; Business Electronics, supra, at 728. Even with the stringent standards in Monsanto and Business Electronics, this danger can lead, and has led, rational manufacturers to take wasteful measures. See, e. g., Brief for PING, Inc., as Amicus Curiae 9-18. A manufacturer might refuse to discuss its pricing policy with its distributors except through counsel knowledgeable of the subtle intricacies of the law. Or it might terminate longstanding distributors for minor violations without seeking an explanation. See ibid. The increased costs these burdensome measures generate flow to consumers in the form of higher prices.
Furthermore, depending on the type of product it sells, a manufacturer might be able to achieve the procompetitive benefits of resale price maintenance by integrating downstream and selling its products directly to consumers. Dr. Miles tilts the relative costs of vertical integration and vertical agreement by making the former more attractive based on the per se rule, not. on real market conditions. See Business Electronics, supra, at 725; see generally. Coase, The Nature of the Firm, 4 Economica, New Series 386 (1937). This distortion might lead to inefficient integration that would not otherwise take place, so that consumers must again suffer the consequences of the suboptimal distribution strategy. And integration, unlike vertical price restraints, eliminates all intrabrand competition. See, e. g., GTE Sylvania, supra, at 57, n. 26.
There is yet another consideration. A manufacturer can impose territorial restrictions on distributors and allow only one distributor to sell its goods in a given region. Our cases have recognized, and the economics literature confirms, that these vertical nonprice restraints have impacts similar to *904 those of vertical price restraints; both reduce intrabrand competition and can stimulate retailer services. See, e. g., Business Electronics, supra, at 728; Monsanto, supra, at 762-763; see also Brief for Economists as Amici Curiae 17-18. Cf. Scherer & Ross 560 (noting that vertical nonprice restraints “can engender inefficiencies at least as serious as those imposed upon the consumer by resale price maintenance”); Steiner, How Manufacturers Deal with the Price-Cutting Retailer: When Are Vertical Restraints Efficient? 65 Antitrust L. J. 407, 446-447 (1997) (indicating that “antitrust law should recognize that the consumer interest is often better served by [resale price maintenance] — contrary to its per se illegality and the rule-of-reason status of vertical nonprice restraints”). The same legal standard (per se unlawfulness) applies to horizontal market division and horizontal price fixing because both have similar economic effect. There is likewise little economic justification for the current differential treatment of vertical price and nonprice restraints. Furthermore, vertical nonprice restraints may prove less efficient for inducing desired services, and they reduce intrabrand competition more than vertical price restraints by eliminating both price and service competition. See Brief for Economists as Amici Curiae 17-18.
In sum, it is a flawed antitrust doctrine that serves the interests of lawyers — by creating legal distinctions that operate as traps for the unwary — more than the interests of consumers — by requiring manufacturers to choose second-best options to achieve sound business objectives.
B
Respondent’s arguments for reaffirming Dr. Miles on the basis of stare decisis do not require a different result. Respondent looks to congressional action concerning vertical price restraints. In 1937, Congress passed the MillerTydings Fair Trade Act, 50 Stat. 693, which made vertical price restraints legal if authorized by a fair trade law *905 enacted by a State. Fifteen years later, Congress expanded the exemption to permit vertical price-setting agreements between a manufacturer and a distributor to be enforced against other distributors not involved in the agreement. McGuire Act, 66 Stat. 632. In 1975, however, Congress repealed both Acts. Consumer Goods Pricing Act, 89 Stat. 801. That the Dr. Miles rule applied to vertical price restraints in 1975, according to respondent, shows Congress ratified the rule.
This is not so. The text of the Consumer Goods Pricing Act did not codify the rule of per se illegality for vertical price restraints. It rescinded statutory provisions that made them per se legal. Congress once again placed these restraints within the ambit of § 1 of the Sherman Act. And, as has been discussed, Congress intended § 1 to give courts the ability “to develop governing principles of law” in the common-law tradition. Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U. S. 630, 643 (1981); see Business Electronics, 485 U. S., at 731 (“The changing content of the term ‘restraint of trade’ was well recognized at the time the Sherman Act was enacted”). Congress could have set the Dr. Miles rule in stone, but it chose a more flexible option. We respect its decision by analyzing vertical price restraints, like all restraints, in conformance with traditional § 1 principles, including the principle that our antitrust doctrines “evolv[e] with new circumstances and new wisdom.” Business Electronics, supra, at 732; see also Easterbrook 139.
The rule of reason, furthermore, is not inconsistent with the Consumer Goods Pricing Act. Unlike the earlier congressional exemption, it does not treat vertical price restraints as per se legal. In this respect, the justifications for the prior exemption are illuminating. Its goal “was to allow the States to protect small retail establishments that Congress thought might otherwise be driven from the marketplace by large-volume discounters.” California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., 445 U. S. *906 97,102 (1980). The state fair trade laws also appear to have been justified on similar grounds. See Areeda & Hovenkamp 298. The rationales for these provisions are foreign to the Sherman Act. Divorced from competition and consumer welfare, they were designed to save inefficient small retailers from their inability to compete. The purpose of the antitrust laws, by contrast, is “the protection of competition, not competitors.” Atlantic Richfield Co. v. USA Petroleum Co., 495 U. S. 328, 338 (1990) (internal quotation marks omitted). To the extent Congress repealed the exemption for some vertical price restraints to end its prior practice of encouraging anticompetitive conduct, the rule of reason promotes the same objective.
Respondent also relies on several congressional appropriations in the mid-1980’s in which Congress did not permit the Department of Justice or the Federal Trade Commission to use funds to advocate overturning Dr. Miles. See, e. g., 97 Stat. 1071. We need not pause long in addressing this argument. The conditions on funding are no longer in place, see, e. g., Brief for United States as Amicus Curiae 21, and they were ambiguous at best. As much as they might show congressional approval for Dr. Miles, they might demonstrate a different proposition: that Congress could not pass legislation codifying the rule and reached a short-term compromise instead.
Reliance interests do not require us to reaffirm Dr. Miles. To be sure, reliance on a judicial opinion is a significant reason to adhere to it, Payne v. Tennessee, 501 U. S. 808, 828 (1991), especially “in cases involving property and contract rights,” Khan, 522 U. S., at 20. The reliance interests here, however, like the reliance interests in Khan, cannot justify an inefficient rule, especially because the narrowness of the rule has allowed manufacturers to set minimum resale prices in other ways. And while the Dr. Miles rule is longstanding, resale price maintenance was legal under fair trade laws *907 in a majority of States for a large part of the past century up until 1975. .
It is also of note that during this time “when the legal environment in the [United States] was most favorable for [resale price maintenance], no more than a tiny fraction of manufacturers ever employed [resale price maintenance] contracts.” Overstreet 6; see also id., at 169 (noting that “no more than one percent of manufacturers, accounting for no more than ten percent of consumer goods purchases, ever employed [resale price maintenance] in any single year in the [United States]”); Scherer & Ross 549 (noting that “[t]he fraction of U. S. retail sales covered by [resale price maintenance] in its heyday has been variously estimated at from 4 to 10 percent”). To the extent consumers demand cheap goods, judging vertical price restraints under the rule of reason will not prevent the market from providing them. Cf. Easterbrook 152-153 (noting that “S.S. Kresge (the old K-Mart) flourished during the days of manufacturers’ greatest freedom” because “discount stores offer a combination of price and service that many customers value” and that “[njothing in restricted dealing threatens the ability of consumers to find low prices”); Scherer & Ross 557 (noting that “for the most part, the effects of the [Consumer Goods Pricing Act] were imperceptible because the forces of competition had already repealed the [previous antitrust exemption] in their own quiet way”).
For these reasons the Court’s decision in Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373 (1911), is now overruled. Vertical price restraints are to be judged according to the rule of reason.
V
Noting that Leegin’s president has an ownership interest in retail stores that sell Brighton, respondent claims Leegin participated in an unlawful horizontal cartel with competing *908 retailers. Respondent did not make this allegation in the lower courts, and we do not consider it here.
The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

It is so ordered.