

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **MPHLEX, LLC, ET AL.,** | ) | |
| | ) | |
| **Appellants,** | ) | |
| | ) | |
| **v.** | ) | **WD86444** |
| | ) | |
| **SOVEREIGN INTERNATIONAL,** | ) | |
| **INC., ET AL.,** | ) | **Filed: April 23, 2024** |
| | ) | |
| **Respondents.** | ) | |

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### THE HONORABLE JERRI J. ZHANG, JUDGE

### BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### ALOK AHUJA, JUDGE, ANTHONY REX GABBERT, JUDGE

MPHlex, LLC, Anthony Pontier, and William Hudnall (collectively, "Appellants")
appeal the entry of summary judgment in favor of Sovereign International, Inc.
("Sovereign"), Nico Grobler, Deon Van Dyk, Relborgn Pty Ltd., and Triomviri Pty Ltd.
(collectively, "Respondents"), on Appellants' claim asserting a *per se* antitrust violation.
Appellants contend the circuit court (1) erroneously shifted the burden of proof; (2)
erroneously determined Sovereign's noncompete agreement did not constitute a *per se*
antitrust violation; (3) erred in ruling in Respondents' favor because they did not meet
their burden of proof on their affirmative defense; (4) erred in determining Appellants

failed to establish an antitrust injury; and (5) erred in awarding Respondents judgment on the alternative basis of the *Noerr-Pennington* doctrine. Appellants also request an award of attorney's fees on appeal. For reasons explained herein, we affirm the judgment and, accordingly, deny Appellants' request for attorney's fees on appeal.

## FACTUAL AND PROCEDURAL HISTORY

The parties agree the material facts are not in dispute. Respondents are associated with an international subsurface grouting business. The principal Respondent, Sovereign, is incorporated under the laws of Missouri, with its principal place of business in New York. On December 25, 2010, John Minturn, the president of Sovereign, executed a confidentiality, non-solicitation, and noncompetition agreement with Sovereign. The agreement included a lifetime agreement to maintain confidentiality and nondisclosure obligations, as well as a non-solicitation and noncompete agreement for one year after his association with Sovereign ended. This agreement was expressly made to limit Minturn's "right to compete only as reasonably necessary to the extent permitted by applicable law and necessary to protect [Sovereign] from unfair competition." On June 5, 2012, Minturn executed a consulting and retainer agreement with Sovereign and Thyssen Mining and Construction of Canada, Inc., which contained its own perpetual post-employment confidentiality obligations.

In December 2017, Minturn resigned from Sovereign. He resigned from Sovereign-Thyssen Joint Venture and Sovereign-Thyssen, LP, on January 10, 2018. After Minturn's resignation, Grobler, who is Sovereign's vice president, wrote to Minturn stating that, even though he was resigning as president, Sovereign wanted Minturn to

2

continue his association with the company as a consultant. Minturn's employment and consulting with Sovereign ended no later than March 31, 2018.

Following his resignation from Sovereign and its related entities, Minturn actively tried to compete with Sovereign by offering to sell a grout like Sovereign's to the New York City Transit Authority. After Sovereign learned that Minturn was trying to compete against it, Sovereign sent a letter to Minturn asking him to sign a new noncompete agreement or face litigation.

On April 18, 2018, Minturn signed a settlement agreement with Sovereign, Sovereign-Thyssen Joint Venture, and Sovereign-Thyssen LP ("the 2018 Settlement").[1] On the same date, Minturn signed a nondisclosure agreement with the same parties ("the 2018 NDA"), which was incorporated into the 2018 Settlement. The 2018 NDA contained a new noncompete agreement in which Minturn agreed that, for a period of 10 years from the date of the agreement, he would not directly or indirectly compete with the business of Sovereign or its affiliates. The noncompete agreement also expressly prohibited Minturn's use of polymer, polyurethane, chemical solution, cementitious material, epoxy, or precipitation materials as grout. Additionally, Minturn agreed not to challenge or contest any patent granted or patent protection applied for by Sovereign or its affiliates, whether such patent was granted or applied for in the United States or in another country or region.

---

[1] Grobler and Van Dyk both signed the 2018 Settlement and the 2018 NDA. Sovereign identified Grobler, Van Dyk, Relborgn, and Triomviri as falling within the "affiliates" class intended to benefit from the 2018 NDA. Van Dyk is the sole director of Triomviri, and Grobler is the sole director of Relborgn.

3

According to Grobler, "a new competitor offering the same or similar products as Sovereign causes harm to Sovereign's business and lowers its value as a company." Grobler believes Minturn "understood the scope" of the non-compete agreement. Sovereign asked Minturn to sign an agreement with a longer noncompete period because he was caught violating his prior noncompete agreement almost immediately after his association with Sovereign ended. Because of the longer noncompete period, Sovereign paid Minturn a one-time payment of $25,000, and agreed to pay him an additional $25,000 in 2023.

Hudnall, Pointier, and MPHlex were Minturn's business associates. By August 2018, Hudnall was aware of the 2018 NDA. By January 2019, Pontier was aware of the 2018 NDA. Between January 10, 2019, and the end of February 2019, Minturn developed a new latex polymer grout that was a competitive product to the product sold by Sovereign.

Sovereign filed suit against Minturn for violating the 2018 NDA. After learning Appellants were aware of Minturn's noncompete agreement in the 2018 NDA and helped him compete against Sovereign anyway, Sovereign also filed suit against Appellants. Appellants then filed counterclaims against Respondents. Over the next four years, several claims and counterclaims were asserted, amended, dropped, or settled. At the December 20, 2022 case management conference, Sovereign reported to the court that all of its affirmative claims had been resolved pursuant to a settlement it had reached with Minturn. Appellants asserted that a single outstanding counterclaim still required

4

resolution: their claim that the noncompete agreement in the 2018 NDA, incorporated into the 2018 Settlement, constituted a *per se* antitrust violation.

Appellants moved for partial summary judgment on the counterclaim on the issue of liability, and Respondents moved for summary judgment on the counterclaim. The parties agreed to the same factual record. Following oral argument, the court entered summary judgment in favor of Respondents on Appellants' counterclaim. The court determined Respondents were entitled to judgment on two grounds. First, the court found that, because settlement agreements are encouraged under the law and noncompete agreements entered ancillary to a permissible agreement are not *per se* illegal under antitrust laws, the noncompete agreement in the 2018 NDA, entered into as part of the 2018 Settlement, was not a *per se* violation of antitrust laws. Second, the court found that the antitrust injuries claimed by Appellants "seem to arise solely from Sovereign's filing of the lawsuit" and, as such, were barred by the *Noerr-Pennington* doctrine, which provides that those who petition the government for redress are generally immune from antitrust liability. Appellants appeal.

## STANDARD OF REVIEW

Appellate review of summary judgment is essentially *de novo*. *Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020). Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 74.04(c)(6). Where, as in this case, the movant is the defendant, the movant establishes the right to judgment as a matter of law by showing one of the following:

5

(1) facts negating any one of the claimant's elements necessary for judgment; (2) that the claimant, after an adequate period of discovery, has not been able to—and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the claimant's elements; or (3) facts necessary to support [its] properly pleaded affirmative defense.

*Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 437 (Mo. banc 2013).  In determining whether the movant has met this burden, we review the summary judgment record in the light most favorable to the party against whom judgment was entered and accord that party the benefit of all reasonable inferences.  *Green,* 606 S.W.3d at 116.

### ANALYSIS

Appellants raise six points on appeal.  We will address Point II first because it is dispositive.  In Point II, Appellants contend the circuit court erred as a matter of law when it determined the noncompete agreement in the 2018 NDA, incorporated in the 2018 Settlement, was not a *per se* antitrust violation.  They argue the uncontroverted material facts "fit squarely within categories of per se antitrust violations in that Sovereign and Minturn were competitors who promised to end competition, restrict output, and allocate markets, customers and potential customers for ten years."[2]

Pursuant to the Missouri Antitrust Law, Sections 416.011 to 416.161, "Every contract, combination or conspiracy in restraint of trade or commerce in this state is

---

[2] Because Appellants assert only that the noncompete agreement is a *per se* antitrust violation, the reasonableness of the temporal and geographic restrictions in the noncompete agreement are not at issue.

unlawful." § 416.031.1.[3]  The Missouri Antitrust Law "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." § 416.141.

"Section 1 of the Sherman Act prohibits 'every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting 15 U.S.C. § 1). The Supreme Court interprets this provision as outlawing only "*unreasonable* restraints." *Id*. (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1977)).  The elements of a cause of action under Section 1 of the Sherman Act consist of:  (1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade; and (3) an effect on interstate commerce.  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996).

There are two standards by which courts can judge whether a restraint is unreasonable.  *Am. Express*, 585 U.S. at 540.  The standard usually applied is the rule of reason, "under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  In conducting a rule of reason analysis, courts consider "a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10.

---

[3]  All statutory references are to the Revised Statutes of Missouri 2016.

The second standard by which courts can find a restraint unreasonable is the *per se* standard, "which is reserved only for those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Dagher,* 547 U.S. at 5 (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States.*, 435 U.S. 679, 692 (1978)). Courts treat these types of restraints as "necessarily illegal," thereby eliminating "the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

A restraint is deemed a *per se* antitrust violation "only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Id*. at 886-87 (internal citations omitted). "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue." *Id*. at 886 (internal quotation marks and citations omitted). "Agreements consistently held per se unreasonable include price fixing, output restrictions, market allocations, and certain group boycotts or concerted refusals to deal." *ZombieBox Int'l Inc. v. Generac Power Sys. Inc.*, No. CV-23-00726-PHX-ROS, 2024 WL 894673, at *6, (D. Ariz. Mar. 1, 2024). The Supreme Court has been reluctant to add new categories of *per se* claims "where the economic impact of certain practices is not immediately obvious." *Khan*, 522 U.S. at 10 (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986)).

Plaintiffs can plead both a rule of reason and a *per se* claim, or they can plead only a *per se* claim. There is a danger to asserting only a *per se* claim, however. "While

8

pleading exclusively per se violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy.  If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed." *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 317 (3d Cir. 2010).

Here, Appellants pled only a *per se* claim, asserting the noncompete agreement in the 2018 NDA was a horizontal customer allocation and horizontal market division. Simply "because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016).  Indeed, where an alleged market allocation agreement arises in a novel factual context with which courts do not have a great deal of experience, courts apply the rule of reason rather than the *per se* rule.  *See id*. at 1083-84.  *See also Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1304 (11th Cir. 2003).

Looking at the factual context surrounding the alleged market allocation in this case, when Minturn was employed by Sovereign, he executed a noncompete agreement with Sovereign and its affiliate that prohibited him from competing against them for one year after his employment ended.  Minturn also agreed to maintain the confidentiality of proprietary information he learned in his employment with Sovereign and through his service as a consultant to the Sovereign-Thyssen Joint Venture.  Within three months of leaving Sovereign, however, Minturn began competing against Sovereign.  Sovereign contended that Minturn's post-employment activities violated both the noncompete agreement and the confidentiality and nondisclosure obligations he owed to Sovereign

9

and the Sovereign-Thyssen Joint Venture. After Sovereign learned that Minturn was trying to compete against it, Sovereign sent a letter to Minturn asking him to sign a new noncompete agreement or face litigation. Minturn agreed to sign the 2018 Settlement, which extended the noncompete period to 10 years because he had just been caught violating his prior noncompete agreement almost immediately after his association with Sovereign ended.

The circumstances under which the noncompete agreement arose in this case are unlike any of the circumstances in the market allocation cases Appellants cite, as none of them involve noncompete agreements entered into between an employer and former employee as part of a settlement agreement to avoid litigation over the employee's breach of a prior noncompete agreement. For example, Appellants cite *Optronic Technologies, Inc., v. Ningbo Sunny Electronic Co., Ltd*., 20 F.4th 466, 481 (9th Cir. 2021), in which the court found that an agreement between two of the biggest manufacturers of telescopes sold in the United States to divide the products they produce and sell to different markets to reduce conflicts between them was a *per se* antitrust violation. In another case Appellants cite, *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), the Supreme Court reviewed an agreement between the two primary bar review providers in Georgia. The Court found the agreement, which contained a revenue-sharing formula and a promise not to compete against each other in certain markets, was formed solely for the purpose of raising the price of the bar review course and, therefore, was a *per se* antitrust violation. *Id*. at 49. Appellants point to no cases in which a noncompete agreement in a factual context similar to ours has been determined to be a *per se* antitrust violation.

There are, however, cases that reject the application of the *per se* rule and analyze noncompete agreements similar to the one here under the rule of reason. For example, in *Haines v. VeriMed Healthcare Network, LLC*, 613 F. Supp. 2d 1133, 1137 (E.D. Mo. 2009), the court held a noncompete agreement that prevented a company's employees from working directly for the company's clients was not a *per se* antitrust violation. In so holding, the court noted that, "[t]o the extent that the agreement . . . constrains competition, it does so only to protect [the company]'s legitimate business interests." *Id*. The court rejected the employee's argument that the noncompete agreement "should form the basis for a new per se violation of antitrust laws, finding it to be "completely without merit." *Id*. The court explained, "Legitimate reasons exist to uphold noncompete covenants even though by nature they necessarily restrain trade to some degree. The recognized benefits of reasonably enforced noncompetition covenants are now beyond question." *Id*. (quoting *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1982)). Here, as in *Haines*, Respondents had a legitimate business interest in keeping its former president from competing with Sovereign using the same or similar products.

Moreover, that the noncompete agreement was entered into as part of a settlement agreement to avoid litigation over Minturn's breach of the first noncompete agreement is another reason why the rule of reason, instead of the *per se* rule, applies. Settlement agreements made to avoid litigation are "encouraged under the law." *Hancock v. Shook*, 100 S.W.3d 786, 799 (Mo. banc 2003). "[S]ettlements rather than litigation will serve the interests of plaintiffs as well as defendants," as they provide a speedier resolution

"without the burdens, stress, and time of litigation." *Marek v. Chesny*, 473 U.S. 1, 10 (1985).

Consequently, a noncompete agreement that is ancillary to a settlement agreement is not just "ancillary to a permissible transaction," but is also "ancillary to an agreement highly favored by the courts." *Justin Belt Co. v. Yost*, 502 S.W.2d 681, 684 (Tex. 1973). Hence, a covenant not to compete between an employer and its former employee that was ancillary to a valid settlement agreement to avoid litigation over a noncompete violation was held enforceable in *Herndon v. Eli Witt Co.*, 420 So.2d 920, 923 (Fla. 1st DCA 1982). Applying a "reasonable standard test," the court explained that the employee "doubtless desired to avoid a lengthy litigation," while the employer "obviously desired that its business security be protected from one who at liberty could do the company immediate harm should he disclose confidential corporate clients, information and trade secrets." *Id*. Therefore, the court concluded that, "under the circumstances disclosed, considerations of public policy, equity and fair dealing favor enforcement of the covenant if it is otherwise reasonable." *Id*.

The undisputed facts show that the noncompete agreement served Sovereign's legitimate business interest and was ancillary to a settlement to avoid litigation over Minturn's breach of his original noncompete agreement. Thus, we cannot say that the noncompete agreement lacked any redeeming virtue. *See Leegin, Inc.*, 551 U.S. at 886. Notably, Minturn does not challenge the validity of the *original* noncompete and confidentiality restrictions to which he agreed in 2010 and 2012. He also does not dispute that a *court* could have enforced the 2010 and 2012 agreements, without violating

12

antitrust laws, by awarding damages or equitable relief to Sovereign. Minturn does not explain why a *settlement agreement* in which the parties agreed to analogous remedies, without court intervention, establishes a *per se* antitrust violation. The restraint in this case is sufficiently different from the *per se* archetypes that it requires application of the rule of reason to determine if it is an antitrust violation. *See Ins. Brokerage Antitrust Litig.*, 618 F.3d at 317. Appellants failed to plead the rule of reason; therefore, the circuit court properly granted summary judgment in favor of Respondents on Appellants' counterclaim. *See id*. Point II is denied. Because this point is dispositive, we need not address Points I, III, IV, V, and VI.

CONCLUSION

The judgment is affirmed. Appellants' request for attorney's fees on appeal is denied.

_____
LISA WHITE HARDWICK, JUDGE

All Concur.