**Spencer MEYER, individually and on behalf of those similarly situated, Plaintiffs,**

v.

**Travis KALANICK, Defendant.**

**15 Civ. 9796**

United States District Court, S.D. New York.

Signed March 31, 2016

Brian Marc Feldman, Edwin Michael Larkin, III, Jeffrey A. Wadsworth, Harter, Secrest & Emery, LLP, Rochester, NY, Andrew Arthur Schmidt, Andrew Schmidt Law PLLC, Portland, ME, for Plaintiffs.

Peter M. Skinner, Boies, Schiller & Flexner LLP, New York, NY, Karen L. Dunn, Ryan Young Park, William A. Isaacson, Boies, Schiller & Flexner LLP, Washington, DC, for Defendant.

## OPINION AND ORDER

JED S. RAKOFF, UNITED STATES DISTRICT JUDGE.

On December 16, 2015, plaintiff Spencer Meyer, on behalf of himself and those similarly situated, filed this putative antitrust class action lawsuit against defendant Travis Kalanick, CEO and co-founder of Uber Technologies, Inc. ("Uber"). *See* Complaint, Dkt. 1. Mr. Meyer's First Amended Complaint, filed on January 29, 2016, alleged that Mr. Kalanick had orchestrated and facilitated an illegal price-fixing conspiracy in violation of Section 1 of the federal Sherman Antitrust Act, 15 U.S.C.

§ 1, and the New York State Donnelly Act, New York General Business Law § 340. *See* First Amended Complaint ("Am.Compl."), Dkt. 26, ¶¶ 120–140. Plaintiff claimed, in essence, that Mr. Kalanick, while disclaiming that he was running a transportation company, had conspired with Uber drivers to use Uber's pricing algorithm to set the prices charged to Uber riders, thereby restricting price competition among drivers to the detriment of Uber riders, such as plaintiff Meyer. *See id.* ¶¶ 1, 7.

On February 8, 2016, defendant Kalanick moved to dismiss the Amended Complaint. *See* Notice of Motion, Dkt. 27. Plaintiff opposed on February 18, 2016; defendant replied on February 25, 2016; and oral argument was held on March 9, 2016.[1] Having considered all of the parties' submissions and arguments, the Court hereby denies defendant's motion to dismiss.

In ruling on a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *Town of Babylon v. Fed. Hous. Fin. Agency,* 699 F.3d 221, 227 (2d Cir.2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). In the antitrust context, stating a claim under Section 1 of the Sherman Act "requires a complaint with enough factual matter (taken as true) to

suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

The relevant allegations of the Amended Complaint are as follows. Uber, founded in 2009, is a technology company that produces an application for smartphone devices ("the Uber App") that matches riders with drivers (called "driver-partners"[2]). *See* Am. Compl. ¶¶ 2, 21, 24, 27. Uber states that it is not a transportation company and does not employ drivers. *See id.* ¶¶ 2, 23. Defendant Kalanick, in addition to being the co-founder and CEO of Uber, is a driver who has used the Uber app. *See id.* ¶ 3. Plaintiff Meyer is a resident of Connecticut, who has used Uber car services in New York. *See id.* ¶ 7.

Through the Uber App, users can request private drivers to pick them up and drive them to their desired location. *See id.* ¶ 24. Uber facilitates payment of the fare by charging the user's credit card or other payment information on file. *See id.* ¶ 32. Uber collects a percentage of the fare as a software licensing fee and remits the remainder to the driver. *See* Am. Compl. ¶ 27. Drivers using the Uber app do not compete on price, *see id.* ¶ 2, and cannot negotiate fares with drivers for rides, *see id.* ¶ 34. Instead, drivers charge the fares set by the Uber algorithm. *See*

---

1. During oral argument, the Court invited both sides to submit letters regarding certain studies cited by plaintiff in the Amended Complaint. *See* Transcript of Proceedings dated March 9, 2016 ("Tr."), 24:12–16. These letters, respectively dated March 11, 2016 ("Pl. Letter") and March 15, 2016 ("Def. Letter"), will be docketed along with this Opinion.

2. The Court uses "drivers" and sometimes "Uber drivers" instead of Uber's term "driver-partners" for the sake of simplicity, but this usage is not meant to imply any employment relationship between Uber and these drivers, which defendant firmly denies.

*id.* ¶ 2. Though Uber claims to allow drivers to depart downward from the fare set by the algorithm, there is no practical mechanism by which drivers can do so. *See id.* ¶ 69. Uber's "surge pricing" model, designed by Mr. Kalanick, permits fares to rise up to ten times the standard fare during times of high demand. *See id.* ¶ 26, 48, 50. Plaintiff alleges that the drivers have a "common motive to conspire" because adhering to Uber's pricing algorithm can yield supra-competitive prices, Am. Compl. ¶ 90, and that if the drivers were acting independently instead of in concert, "some significant portion" would not agree to follow the Uber pricing algorithm. *See id.* ¶ 93.

Plaintiff further claims that the drivers "have had many opportunities to meet and enforce their commitment to the unlawful agreement." Am. Compl. ¶ 92. Plaintiff alleges that Uber holds meetings with potential drivers when Mr. Kalanick and his subordinates decide to offer Uber App services in a new geographic location. *See id.* ¶ 40. Uber also organizes events for its drivers to get together, such as a picnic in September 2015 in Oregon with over 150 drivers and their families in attendance, and other "partner appreciation" events in places including New York City. *See id.* ¶ 41. Uber provides drivers with information regarding upcoming events likely to create high demand for transportation and informs the drivers what their increased earnings might have been if they had logged on to the Uber App during busy periods. *See id.* ¶ 58. Moreover, plaintiff alleges, in September 2014 drivers using the Uber App in New York City colluded with one another to negotiate the reinstitution of higher fares for riders using Uber-BLACK and UberSUV services (certain Uber car service "experiences"). *See id.* ¶¶ 25, 87. Mr. Kalanick, as Uber's CEO, directed or ratified negotiations between Uber and these drivers, and Uber ultimately agreed to raise fares. *See id.* ¶ 87.

As to market definition, plaintiff alleges that Uber competes in the "relatively new mobile app-generated ride-share service market," of which Uber has an approximately 80% market share. Amended Complaint ¶ 94–95. Uber's chief competitor in this market, Lyft, has only a 20% market share, and a third competitor, Sidecar, left the market at the end of 2015. *See id.* ¶¶ 95–96. Although, plaintiff contends, neither taxis nor traditional cars for hire are reasonable substitutes for mobile app-generated ride-share service, Uber's own experts have suggested that in certain cities in the U.S., Uber captures 50% to 70% of business customers in the combined market of taxis, cars for hire, and mobile-app generated ride-share services. *See id.* ¶ 107.

Plaintiff claims to sue on behalf of the following class: "all persons in the United States who, on one or more occasions, have used the Uber App to obtain rides from uber driver-partners and paid fares for their rides set by the Uber pricing algorithm," with certain exclusions, such as Mr. Kalanick. *See id.* ¶ 13. Plaintiff also identifies a "subclass" of riders who have paid fares based on surge pricing. *See id.* ¶ 114. Plaintiff alleges that he and the putative class have suffered antitrust injury because, were it not for Mr. Kalanick's conspiracy to fix the fares charged by Uber drivers, drivers would have competed on price and Uber's fares would have been "substantially lower." *See id.* ¶ 109. Plaintiff also contends that Mr. Kalanick's design has reduced output and that, as "independent studies have shown," the effect of surge pricing is to lower demand so that prices remain artificially high. Am. Compl. ¶ 110. Based on these allegations, plaintiff claims that Mr. Kalanick has violated the Sherman Act, 15 U.S.C. § 1, and

the Donnelly Act, New York General Business Law § 340. *See id.* ¶¶ 120–140.

■ The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. "[A] plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities." *Capital Imaging Associates, P.C. v. Mohawk Valley Med. Associates, Inc.,* 996 F.2d 537, 542 (2d Cir.1993). "If a § 1 plaintiff establishes the existence of an illegal contract or combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Id.* at 542.

■ "Conduct considered illegal per se is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination." *Id.* (internal citation and quotation marks omitted). By contrast, "most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, na-

ture, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

■ Antitrust law also distinguishes between vertical and horizontal price restraints. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices," while, at least in the context of resale price maintenance, "[v]ertical price restraints are to be judged according to the rule of reason." *Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 886, 907, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007). In the instant case, the Court finds that plaintiff has adequately pled both a horizontal and a vertical conspiracy.

■ As to the horizontal conspiracy, plaintiff alleges that Uber drivers agree to participate in a conspiracy among themselves when they assent to the terms of Uber's written agreement (the "Driver Terms") and accept riders using the Uber App. *See* Am. Compl. ¶¶ 70–71. In doing so, plaintiff indicates, drivers agree to collect fares through the Uber App, which sets fares for all Uber drivers according to the Uber pricing algorithm. *See id.*[3] In

---

**3.** Defendant Kalanick contends that Uber's Driver Terms "do provide that driver-partners have the discretion to charge less than the suggested price determined by Uber's pricing algorithm." Reply Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Dismiss, Dkt. 34 ("Def. Reply Br.") at 2 n.1, citing Declaration of Michael Colman, Dkt. 29, Exhibit 2 ("Driver Terms") ¶ 4.1 ("Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged fare ..."). "Customer" here refers to "an independent company in the business of providing transportation services," that is, Uber's driver-partners. *See* Driver Terms; Memorandum of Law in Opposition to Defendant Travis Kalanick's Motion to Dismiss ("Pl.Opp.Br.") at 4. Plaintiff points out, how-

plaintiff's view, Uber drivers forgo competition in which they would otherwise have engaged because they "are guaranteed that other Uber drivers will not undercut them on price." *See id.* ¶ 72; Memorandum of Law in Opposition to Defendant Travis Kalanick's Motion to Dismiss ("Pl. Opp.Br."), Dkt. 33, at 11. Without the assurance that all drivers will charge the price set by Uber, plaintiff contends, adopting Uber's pricing algorithm would often not be in an individual driver's best interest, since not competing with other Uber drivers on price may result in lost business opportunities. *See* Am. Compl. ¶ 72. The capacity to generate "supracompetitive prices" through agreement to the Uber pricing algorithm thus provides, according to plaintiff, a "common motive to conspire" on the part of Uber drivers. *See* Amended Complaint ¶ 90. Plaintiff also draws on its allegations about meetings among Uber drivers and the "September 2014 conspiracy," in which Uber agreed to reinstitute higher fares after negotiations with drivers, to bolster its claim of a horizontal conspiracy. *See* Pl. Opp. Br. at 14–15; Am. Compl. ¶¶ 41, 87, 92. In plaintiff's view, defendant Kalanick is liable as the organizer of the price-fixing conspiracy, Am. Compl. ¶¶ 76, 88; Pl. Opp. Br. at 9, and as an Uber driver himself, *see id.* ¶¶ 80–85.

Defendant Kalanick argues, however, that the drivers' agreement to Uber's Driver Terms evinces no horizontal agreement among drivers themselves, as distinct from vertical agreements between each driver and Uber. *See* Memorandum of Law in Support of Defendant Travis Kalanick's Motion to Dismiss ("Def.Br."), Dkt. 28, at 9, 12–13; Transcript of Oral Argument dated March 9, 2016 ("Tr.") 3:19–22. According to Mr. Kalanick, drivers' individual decisions to enter into contractual arrangements with Uber constitute mere independent action that is insufficient to support plaintiff's claim of a conspiracy. *See* Def. Br. at 9. Defendant asserts that the most "natural" explanation for drivers' conduct is that each driver "independently decided it was in his or her best interest to enter a vertical agreement with Uber," and doing so could be in a driver's best interest because, for example, Uber matches riders with drivers and processes payment. *See* Def. Br. at 12–13. In defendant's view, the fact that "a condition of [the agreement with Uber] was that the driver-partner agree to use Uber's pricing algorithm" does not diminish the independence of drivers' decisions. *See id.* at 13.

It follows, defendant contends, that such vertical arrangements do not support a horizontal conspiracy claim. *See* Def. Br. at 13–14, citing, *e.g.*, *Leegin*, 551 U.S. at 885, 127 S.Ct. 2705 (manufacturer's agreements requiring retailers to charge certain minimum prices, a form of "vertical minimum resale price maintenance," were to be judged by the rule of reason); *United States v. Colgate & Co.*, 250 U.S. 300, 307,

---

ever, that the Driver Terms also require drivers to agree that "the Fare provided under the Fare Calculation is the only payment Customer will receive in connection with the provision of Transportation Services," Driver Terms ¶ 4.1, and that more importantly, "there is no mechanism by which drivers can charge anything but the App-dictated fare." Memorandum of Law in Opposition to Defendant Travis Kalanick's Motion to Dismiss ("Pl.Opp.Br."), Dkt. 33, at 4. For the purposes

of evaluating defendant's motion to dismiss, the Court will assume that drivers have no practical mechanism by which to depart from the fares set by Uber's algorithm. Defendant acknowledges that any discretion drivers may have to charge a lower fare "is not material to this motion," Def. Reply Br. at 2 n.1, and oral argument proceeded on the assumption that Uber sets mandatory prices for drivers to charge. *See* Transcript of Oral Argument dated March 9, 2016 at 4:12–16.

39 S.Ct. 465, 63 L.Ed. 992 (1919) (a manufacturer with no purpose to create a monopoly may "exercise his own independent discretion as to parties with whom he will deal" and "announce in advance the circumstances under which he will refuse to sell").

The Court, however, is not persuaded to dismiss plaintiff's horizontal conspiracy claim. In *Interstate Circuit v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), the Supreme Court held that competing movie distributors had unlawfully restrained trade when they each agreed to a theater operator's terms, including price restrictions, as indicated in a letter addressed to all the distributors. For an illegal conspiracy to exist, the Supreme Court stated:

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.... Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.

*Interstate Circuit*, 306 U.S. at 226–27, 59 S.Ct. 467. Much more recently, the Second Circuit stated:

> [C]ourts have long recognized the existence of "hub-and-spoke" conspiracies in which an entity at one level of the market structure, the "hub," coordinates an agreement among competitors at a different level, the "spokes." These arrangements consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the [hub's] terms, often because the spokes would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing.

*United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir.2015), *cert. denied,* Mar. 7, 2016 (internal citation and quotation marks omitted); *see also Laumann v. Nat'l Hockey League*, 907 F.Supp.2d 465, 486–87 (S.D.N.Y.2012)("where parties to vertical agreements have knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge, they may be considered participants in a horizontal agreement in restraint of trade.").

In this case, plaintiff has alleged that drivers agree with Uber to charge certain fares with the clear understanding that all other Uber drivers are agreeing to charge the same fares. *See* Amended Complaint ¶¶ 70–71. These agreements are organized and facilitated by defendant Kalanick, who as at least an occasional Uber driver, is also a member of the horizontal conspiracy. *See id.* ¶ 76, 84.

On a motion to dismiss, the Court is required to draw all reasonable inferences in plaintiff's favor. *See Town of Babylon*, 699 F.3d at 227. Given this standard, the Court finds that plaintiffs have plausibly alleged a conspiracy in which drivers sign up for Uber precisely "on the understanding that the other [drivers] were agreeing to the same" pricing algorithm, and in which drivers' agreements with Uber would "be against their own interests were they acting independently." *Apple*, 791 F.3d at 314, 320. Further, drivers' ability to benefit from reduced price competition with other drivers by agreeing to Uber's Driver Terms plausibly constitutes "a common motive to conspire." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir.1987). The fact that drivers may also, in signing up for Uber, seek to benefit from other services that Uber provides, such as connecting riders to drivers and processing

payment, is not to the contrary. Of course, whether plaintiff's allegations are in fact accurate is a different matter, to be left to the fact-finding process.

■ The Court's conclusion that plaintiff has alleged a plausible horizontal conspiracy is bolstered by plaintiff's other allegations concerning agreement among drivers. Plaintiff, as noted *supra*, contends that Uber organizes events for drivers to get together, *see* Am. Compl. ¶ 41, and, more importantly, that Mr. Kalanick agreed to raise fares following drivers' efforts to negotiate higher rates in September 2014. *See id.* ¶ 87.[4] While it is true that these allegations about agreements among drivers reaching even beyond acceptance of Uber's Driver Terms are not extensive, *see* Def. Reply Br. at 7 n.8, nonetheless, they provide additional support for a horizontal conspiracy, and plaintiff need not present a direct, "smoking gun" evidence of a conspiracy, particularly at the pleading stage. *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir.2013).

■ More basically, it is well to remember that a Sherman Act conspiracy is but one form of conspiracy, a concept that is as ancient as it is broad. It is fundamental to the law of conspiracy that the agreements that form the essence of the misconduct are not to be judged by technical niceties but by practical realities. Sophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit. Recently, for example, in *United States v. Ulbricht*, the Government alleged

that defendant Ulbricht had organized an online marketplace for illicit goods and services called Silk Road. *See United States v. Ulbricht*, 31 F.Supp.3d 540, 546–47 (S.D.N.Y.2014). In ruling on motions in limine in *Ulbricht*, Judge Forrest rejected the defense's argument that transactions among Silk Road's users gave rise to "only buy-sell relationships and not conspiratorial behavior" or, at most, to "a multitude of discrete conspiracies." *United States v. Ulbricht*, 79 F.Supp.3d 466, 481 (S.D.N.Y. 2015). Instead, Judge Forrest noted that the Government charged the defendant with sitting "atop an overarching single conspiracy, which included all vendors who sold any type of narcotics on Silk Road at any time." *Id.* at 490. In the instant case, Uber's digitally decentralized nature does not prevent the App from constituting a "marketplace" through which Mr. Kalanick organized a horizontal conspiracy among drivers.

Defendant argues, however, that plaintiff's alleged conspiracy is "wildly implausible" and "physically impossible," since it involves agreement "among hundreds of thousands of independent transportation providers all across the United States." Def. Br. at 1. Yet as plaintiff's counsel pointed out at oral argument, the capacity to orchestrate such an agreement is the "genius" of Mr. Kalanick and his company, which, through the magic of smartphone technology, can invite hundreds of thousands of drivers in far-flung locations to agree to Uber's terms. *See* Tr. 12:15–16. The advancement of technological means for the orchestration of large-scale price-fixing conspiracies need not leave antitrust law behind. *Cf. Ulbricht*, 31 F.Supp.3d at

4. Though defendant's counsel argued at oral argument that if these events were "an antitrust violation, Mr. Kalanick would be a victim and not a participant in the conspiracy," since he allegedly initially opposed the higher

rates, Tr. 37:8–9, the fact remains that, if plaintiff's allegations are taken as true, Mr. Kalanick agreed to a fare raise that set higher fares for all Uber drivers in the relevant groups.

559 ("if there were an automated telephone line that offered others the opportunity to gather together to engage in narcotics trafficking by pressing "1," this would surely be powerful evidence of the button-pusher's agreement to enter the conspiracy. Automation is effected through a human design; here, Ulbricht is alleged to have been the designer of Silk Road . . ."). The fact that Uber goes to such lengths to portray itself—one might even say disguise itself—as the mere purveyor of an "app" cannot shield it from the consequences of its operating as much more.

Recent jurisprudence on vertical resale price maintenance agreements does not, as defendant would have it, undermine plaintiff's claim of an illegal horizontal agreement. *See* Def. Br. at 15. In *Leegin*, the Supreme Court held that resale price maintenance agreements—*e.g.*, a retailer's agreement with a manufacturer not to discount the manufacturer's goods beneath a certain price—are to be judged by the rule of reason, unlike horizontal agreements to fix prices, which are *per se* illegal. *See Leegin*, 551 U.S. at 886, 907, 127 S.Ct. 2705. The Court cited various "procompetitive justifications for a manufacturer's use of resale price maintenance," *id.* at 889, 127 S.Ct. 2705, and concluded that although this practice may also have anticompetitive effects, the rule of reason is the best approach to distinguishing resale price maintenance agreements that violate the antitrust laws from those that do not. *See id.* at 897–900, 127 S.Ct. 2705.

Here, unlike in *Leegin*, Uber is not selling anything to drivers that is then resold to riders.[5] Moreover, the justifications for rule of reason treatment of resale price maintenance agreements offered in *Leegin* are not directly applicable to the instant case. *See* Pl. Opp. Br. at 15–16; Tr. 20–21. In particular, the Court's attention has not been drawn to concerns about free-riding Uber drivers, or to efforts that Uber drivers could make to promote the App that will be under-provided if Uber does not set a pricing algorithm. *See Leegin*, 551 U.S. at 890–91, 127 S.Ct. 2705. While Mr. Kalanick asserts that Uber's pricing algorithm facilitates its market entry as a new brand, *see* Def. Br. at 16–17, this observation—which is fairly conclusory—does not rule out a horizontal conspiracy among Uber drivers, facilitated by Mr. Kalanick both as Uber's CEO and as a driver himself. The Court therefore finds that plaintiff has adequately pleaded a horizontal antitrust conspiracy under Section 1 of the Sherman Act.

■ As to plaintiff's claim of a vertical conspiracy, a threshold question is whether plaintiff has alleged a vertical conspiracy in the Amended Complaint, which defendant denies. *See* Def. Reply Br. at 8; Def. Letter at 1. Although plaintiff's allegations of a vertical conspiracy are much more sparse than his contentions about a horizontal conspiracy, the Court finds that the Amended Complaint adequately pleads a vertical conspiracy between each driver and Mr. Kalanick.[6] In particular, plaintiff

---

**5.** *Leegin*'s statement that "[t]o the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason," 551 U.S. at 893, 127 S.Ct. 2705, thus does not clearly apply to the instant case, since Uber is setting no minimum resale prices. Moreover, *Leegin* did not purport to overrule *Interstate Circuit*, which, for the reasons described *supra*, permits a

finding of a conspiracy among competitors in circumstances such as those of the instant case. *See Interstate Circuit*, 306 U.S. at 226–27, 59 S.Ct. 467.

**6.** Indeed, defendant himself referred in the briefing to "a vertical price arrangement like that described in the Amended Complaint." Def. Br. at 17. *But see* Def. Reply Br. at 8 ("The Amended Complaint . . . does not allege

alleges that "[a]ll of the independent driver-partners have agreed to charge the fares set by Uber's pricing algorithm," Am. Compl. ¶ 68, and that Mr. Kalanick designed this business model, *see id.* ¶¶ 76, 78. The Amended Complaint also includes several allegations that would be pertinent to a rule of reason, vertical price-fixing theory. *See id.* ¶¶ 94–108. Under the Sherman Act count, plaintiff states that the "unlawful arrangement consists of a series of agreements between Kalanick and each of the Uber driver-partners, as well as a conscious commitment among the Uber driver-partners to the common scheme of adopting the Uber pricing algorithm ..." Am. Compl. ¶ 124. Plaintiff claims that Mr. Kalanick is *per se* liable as organizer of the conspiracy and as an occasional Uber driver, ¶¶ 128–29, and then states that "[i]n the alternative, Kalanick is also liable under Section 1 of the Sherman Act under a 'quick look' or 'rule of reason' analysis." *Id.* ¶ 130. In the Court's view, these allegations of legal theory, when coupled with the allegations of pertinent facts, are sufficient to plead a vertical conspiracy theory.

The question, then, is whether this theory is plausible under a "rule of reason" analysis. Under this analysis, "plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Capital Imaging,* 996 F.2d at 543. "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001) (internal citation and quotation marks omitted).

As to market definition, plaintiff defines the relevant market as the "mobile app-generated ride-share service market." Am. Compl. ¶ 94. Plaintiff alleges that Uber has an approximately 80% market share in the United States in this market; Uber's chief competitor Lyft has nearly a 20% market share; and a third competitor, Sidecar, left the market at the end of 2015. *Id.* ¶¶ 95–97. Plaintiff then explains that traditional taxi service is not a reasonable substitute for Uber, since, for example, rides generated by a mobile app can be arranged at the push of a button and tracked on riders' mobile phones; riders need not carry cash or a credit card, or, upon arrival, spend time paying for the ride; and riders can rate drivers and see some information on them before entering the vehicle. *Id.* ¶ 104. Indeed, plaintiff claims, Uber has itself stated that it does not view taxis as ride-sharing competition. *Id.* ¶ 105.

Plaintiff also alleges that traditional cars for hire are not reasonable substitutes, since they generally need to be scheduled in advance for prearranged locations. *Id.* ¶ 106. However, plaintiff nevertheless contends that "Uber has obtained a significant share of business in the combined markets of taxis, cars for hire, and mobile-app generated ride-share services," and that Uber's own experts have suggested that in some U.S. cities, Uber has 50% to 70% of business customers "among all types of rides," which seems to refer to these combined markets. *Id.* ¶ 107.

Defendant contests plaintiff's proposed market definition, arguing that plaintiff provides inadequate justification for the exclusion not just of taxis and car services, but also of public transit such as subways and buses, personal vehicle use, and walking. *See* Def. Br. at 18; Def. Reply Br. at

a vertical restraint in violation of the antitrust laws.").

8. In defendant's view, "[e]ach of these alternatives is a clear substitute for the services provided by driver-partners." Def. Br. at 18.

■ One could argue this either way (and defendant's attorneys are encouraged to hereinafter walk from their offices to the courthouse to put their theory to the test). But for present purposes, plaintiff has provided plausible explanations for its proposed market definition, and the accuracy of these explanations may be tested through discovery and, if necessary, trial. "Market definition is a deeply fact-intensive inquiry [and] courts [therefore] hesitate to grant motions to dismiss for failure to plead a relevant product market." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir.2008). Plaintiff's allegation that Uber—an industry member—recognizes that it does not compete with taxis, *see* Am. Compl. ¶ 105, also deserves consideration. *See Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (declining to exclude evidence of industry recognition from the analysis of market definition). The Court finds that plaintiff has pleaded a plausible relevant product market. *See Capital Imaging Associates*, 996 F.2d at 546.

■ The Court further finds that plaintiff has adequately pleaded adverse effects in the relevant market. Specifically, plaintiff pleads that "Kalanick's actions have further restrained competition by decreasing output," Am. Compl. ¶ 110 (citing "independent studies"); "Uber's market position has already helped force Sidecar out of the marketplace," *id.* ¶ 102; "Uber's dominant position and considerable name recognition has also made it difficult for potential competitors to enter the marketplace," *id.* ¶ 103.[7]

Defendant counters that Uber provides many pro-competitive benefits, *see* Def. Reply Br. at 9, and also disputes the conclusions that plaintiff purports to draw from the cited studies. *See* Def. Letter. Defendant's counter-assertions, while certainly well worth a fact-finder's consideration, do not persuade the Court to grant a motion to dismiss. The Court hence determines that plaintiff has plausibly pleaded adverse effects in the relevant market. Consequently, the Court finds that plaintiff has presented a plausible claim of a vertical conspiracy under Section 1 of the Sherman Act.

■ Finally, the Court addresses plaintiff's state law Donnelly Act claim. The Second Circuit has held that this New York antitrust statute "was modeled on the Sherman Act and has generally been construed in accordance with federal precedents." *Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n. 2 (2d Cir.2011). Though plaintiff contends that his Donnelly Act claim survives even if his Sherman Act claim fails, *see* Pl. Opp. Br. at 21, the Court has no occasion to assess this contention, for it holds that plaintiff's Sherman Act claim withstands defendant's motion to dismiss and, for the same reasons, the Court declines to dismiss plaintiff's Donnelly Act claim.[8]

---

7. In plaintiff's letter submitted after oral argument, plaintiff further described the "independent studies" quoted anonymously in Amended Complaint ¶ 110 that supposedly support these assertions. *See* Pl. Letter.

8. Defendant argues that plaintiff is equitably estopped from avoiding the class action waiver in the user agreement that plaintiff made

with Uber. *See* Def. Br. at 21; Colman Declaration, Dkt. 29, Exhibit 1 (User Agreement), at 8–9. The relevant provision of the User Agreement reads:

Dispute Resolution: You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement ... will be settled by binding arbitration ... *You acknowledge and agree that you and*

For these reasons, the Court denies defendant Kalanick's motion to dismiss. Concomitantly, the Court lifts the stay of discovery previously imposed pending the Court's decision on this motion. Counsel are directed to submit to the Court, by no later than April 7, 2016, a case management plan in the Court's Form D that will have this case ready for trial by November 1, 2016.

The Clerk of Court is directed to close docket entries 22 and 27.

*Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.*
User Agreement at 8–9. Although plaintiff has sued Mr. Kalanick personally and not Uber, defendant claims that plaintiff's claims against Mr. Kalanick are "intimately founded in and intertwined with" the underlying agreement with Uber. *See* Def. Br. at 23, quoting *Kramer v. Toyota Motor Corp.,* 705 F.3d 1122, 1128 (9th Cir.2013). The Court finds, however, that since defendant is not seeking to compel arbitration, and plaintiff is not seeking to enforce the User Agreement against defendant, plaintiff is not equitably estopped from pursuing a class action suit against Mr. Kalanick, nor has plaintiff waived the right to proceed through this mechanism.